UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SPYROS PANOS,

                              Plaintiff,

           v.

UNIVERSAL FOREST PRODUCTS, INC.
*and* SHAWNLEE CONSTRUCTION, LLC,

                             Defendants.

No. 18-CV-2066 (KMK)

OPINION & ORDER

Appearances:

Gabriel J. Fischbarg, Esq.
Toptani Law Offices
New York, NY
*Counsel for Plaintiff*

Christopher J. Dioguardi, Esq.
Jeffrey A. Udell, Esq.
Walden Macht & Haran LLP
New York, NY
*Counsel for Defendants*

Gary J. Mouw, Esq.
Varnum LLP
Grand Rapids, MI
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

      Plaintiff Spyros Panos ("Plaintiff") brings this Action against Universal Forest Products, Inc. ("UFP") and Shawnlee Construction, LLC ("Shawnlee") (collectively, "Defendants"), asserting a claim for aiding and abetting fraud. (*See generally* Second Am. Compl. ("SAC") (Dkt. No. 41).) Before the Court is Defendants' Motion To Dismiss the Second Amended Complaint (the "Motion"), pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Defs.'

Not. of Mot. ("Defs.' Mot.") (Dkt. No. 55).) For the following reasons, Defendants' Motion is granted in part and denied in part.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint ("SAC"). The facts are taken as true for the purpose of resolving the instant Motion.

In July 2007, DES Development LLC ("DES") entered into an agreement with John Berian and June Berean to purchase 22 acres of property at 20-70 State Route 99 in Ulster County, NY (the "Highland Square Property"). (SAC ¶ 11.) In December 2008, Vineyard Commons Holdings, LLC ("VCH") purchased a property located at 330 Vineyard Street in Highland, NY (the "Vineyard Property"). (*Id.*) In June 2010, Wappinger Gardens, LLC, a New York limited liability company formed in October 2009, purchased a property located at Field Map 10357 in Wappinger, NY (the "Wappinger Property"). (*Id.*)

In April 2009, Michael Barnett ("Mr. Barnett"), acting on behalf of his wife Denise Barnett ("Ms. Barnett"), who was a manager of DDFM, LLC ("DDFM"), the manager of VCH, and a "managing member" of DES, informed Plaintiff that VCH and DES would "only be able to develop the Vineyard Property and the Highland Square Property . . . if VCH and DES . . . obtained financing that was insured by the U.S. Department of Housing and Urban Development ('HUD')." (*Id.* ¶ 12.) Mr. Barnett represented that "VCH and DES would use legal methods to attempt to secure such financing." (*Id.*) Mr. Barnett also represented that "other entities not yet created and to be under his or [Ms. Barnett's] control" would also require financing insured by HUD to develop other properties that included the Wappinger Property, and that "such entities would use legal methods to attempt to secure such financing." (*Id.* ¶ 14.)

2

Relying on these representations, on May 1, 2009, Plaintiff entered into an agreement with Ms. Barnett to purchase her five percent membership interest in VCH for $500,000. (*Id.* ¶ 15.) On May 20, 2009, Plaintiff also entered into an agreement with DES to purchase a five percent membership interest in Highland Square Development LLC ("HSD"), an entity "designated by DES to purchase a portion of the Highland Square Property," and a five percent membership interest in Windows Of The Hudson Valley, LLC ("WOTHV"), "an entity formed by DES to operate an assisted living facility at the portion of the Highland Square Property owned by HSD." (*Id.* ¶ 16.) Plaintiff paid a total of $715,000 between May 2009 and May 2010 for these interests. (*Id.*)

In March 2009, Defendant UFP, Defendant Shawnlee, VCH, and J.K. Scanlan Company Inc. ("Scanlan"), VCH's general contractor for the Vineyard Property, entered into an "illegal agreement" pursuant to which UFP and Shawnlee, as subcontractors for the Vineyard Property, agreed to bill VCH, through Scanlan, for labor and materials "in an amount approximately $865,000 greater than the amount actually incurred by UFP and Shawnlee," intending that the difference between the actual cost and the inflated contract price be returned to VCH as a "kickback." (*Id.* ¶ 21.) The mortgager on the Vineyard Property, VCH's lender, would "unwittingly finance the kickback by disbursing HUD-insured funds on the basis of inflated draw requests." (*Id.*) From approximately July 2009 to January 2012, VCH "and/or" UFP received the $865,000 in HUD-insured funds from VCH's lender through the kickback scheme. (*Id.*) Because VCH "required additional funds in order to secure HUD-insured financing . . . to develop the Property," UFP issued a $650,000 letter of credit to VCH's lender in June 2009. (*Id.* ¶ 22.) In June 2009, "UFP, Shawnlee, and VCH agreed that the letter of credit was secured by the illegal $865,000 kickback." (*Id.*)

3

The "HUD closing" for the Vineyard Property occurred in July 2009. (*Id.* ¶ 23.) To celebrate the closing, Mr. Barnett had a party at his home in September 2009. (*Id.*) Plaintiff, Plaintiff's wife, Robert Lees ("Lees"), a senior executive of UFP and Shawnlee, and Kevin DiCello ("DiCello"), a vice president of operations of UFP and Shawnlee, were in attendance, as well as "other representatives, including some from Scanl[a]n." (*Id.*) Lees and DiCello informed Plaintiff that they were "pleased that [P]laintiff and his wife were investors," and that "the Vine[yard] project could not have become a reality without them." (*Id.*) Lees and DiCello also informed Plaintiff that the Highland Square project would "become an even bigger and better project than the Vine[yard] project." (*Id.*) They "urged" Plaintiff to invest in Highland Square and Mr. Barnett's other projects, including that involving the Wappinger Property. (*Id.*) Plaintiff met Lees and DiCello at "various other parties," including at a "ground breaking ceremony and ribbon cutting ceremony for [the] Vine[yard] Property" in June 2010. (*Id.*) At these parties, Lees and DiCello "acknowledged [P]laintiff's role as an investor in Mr. Barnett's real estate projects." (*Id.*)

In December 2010, HSD and Route 299 Retail Center, LLC ("Route 299"), two entities designated by DES, purchased the Highland Square Property "pursuant to DES's agreement with John Berian and June Berean." (*Id.*)

In June 2011, Mr. Barnett, acting on behalf of Ms. Barnett, who was also a "managing member" of Wappinger Gardens LLC ("Wappinger"), informed Plaintiff that Wappinger "would only be able to develop the Wappinger Property . . . if [it] obtained financing that was insured by HUD in a similar manner as the Vineyard Property and the Highland Square Property," and that Wappinger "would use legal methods to attempt to secure such financing." (*Id.* ¶ 17.) Relying on these representations, along with Mr. Barnett's earlier April 2009 representation regarding the

4

Wappinger Property, (*id.* ¶ 14), Plaintiff entered into an agreement with Wappinger in June 2011 to purchase a five percent membership interest in "such LLC that owned the Wappinger Property," (*id.* ¶ 18).[1] "Pursuant to [the] agreement," Plaintiff paid a total of $80,000 in separate payments from July 2011 to December 2012. (*Id.*)

In "approximately 2013," VCH could not complete the development of the Vineyard Property "once the scheme to defraud HUD was exposed to HUD." (*Id.* ¶ 24.) As a result, VCH defaulted on its mortgage on the Vineyard Property, and in 2013, HUD assumed the loan and sold the Property to recoup its loan. (*Id.*) Similarly, in "approximately 2013," HSD could not complete the development of its portion of the Highland Square Property. (*Id.* ¶ 25.) As a result, HSD defaulted on its mortgage on the Highland Square Property, and UFP Atlantic Division LLC ("UFP Atlantic"), a division of UFP, foreclosed on the Property as the mortgagee. (*Id.* ¶ 26.) UFP Atlantic recouped a portion of its loan at the foreclosure auction. (*Id.*) Lastly, in "approximately 2013," Wappinger could not complete the development of the Wappinger Property. (*Id.* ¶ 28.) Wappinger defaulted on its mortgage, (*id.*), and UFP Eastern Division ("UFP Eastern"), a division of UFP, obtained possession of the Property as the mortgagee, (*id.* ¶ 29). UFP Eastern recouped a portion of its loan. (*Id.*) Plaintiff lost the entire value of his membership interests in the three projects as a result of the defaults. (*Id.* ¶¶ 24, 27, 29.) In total, Plaintiff "paid and lost at least $1,240,000." (*Id.* ¶ 33.)

In 2015, the U.S. Government indicted Lees, Dicello, and Mr. Barnett for their involvement in the scheme. (*Id.* ¶ 30.) Mr. Barnett was originally indicted on January 13, 2015. *See United States v. Barnett*, No. 7:15-CR-17 (S.D.N.Y. Jan. 13, 2015). On May 6, 2015, the

---

[1] The Court assumes throughout this Opinion that Wappinger was the LLC in which Plaintiff purchased an interest.

U.S. Attorney's Office returned a superseding indictment for Lees, DiCello, and Mr. Barnett, and issued a press release detailing the charges. *See United States v. Barnett*, No. 7:15-CR-17 (S.D.N.Y. May 6, 2015). On May 20, 2016, "the U.S. Attorney's Office for the Southern District of New York issued a press release advising the public that a jury had found that . . . Lees had committed the acts and wrongdoing described." (*Id.* ¶ 30.) Plaintiff first learned of the wrongdoing committed by VCH and DES upon reading this press release. (*Id.* ¶ 31.) On November 21, 2016, Mr. Barnett pled guilty to the charges, and on November 23, 2016, Lee's "motion to vacate the jury's findings" was denied. (*Id.* ¶ 32.) On June 9, 2017, DiCello also pled guilty to the charges. (*Id.*)

### B. Procedural Background

Plaintiff filed the original Complaint on March 7, 2018, (Compl. (Dkt. No. 1)), and filed the First Amended Complaint ("FAC") on May 21, 2018, (First Am. Compl. ("FAC") (Dkt. No. 19)), after Defendants filed an initial pre-motion letter, (Dkt. No. 14). The FAC dropped Plaintiff's initial negligence claim against Defendants, leaving only his claim for aiding and abetting fraud with respect to the Highlands Square Property and the Vineyard Property. (*See generally* FAC.) With leave of the Court, Defendants filed a Motion To Dismiss on August 16, 2018, arguing that Plaintiff's claim was time-barred and that it failed as a matter of law. (Dkt. Nos. 28–30; *see generally* Defs.' Mem. in Supp. of Mot. To Dismiss the FAC ("Defs.' FAC Mem.") (Dkt. No. 29).) On September 20, 2018, Plaintiff filed an Opposition and Cross-Motion To Amend the FAC. (Dkt. Nos. 31–33.) Plaintiff included a proposed SAC with his papers, which added claims about the Wappinger Property transaction. (Dkt. No. 32.) Defendants filed a Reply on October 4, 2018. (Dkt. No. 34.)

On March 5, 2019, the Court scheduled oral argument on Defendants' Motion To Dismiss the FAC and Plaintiff's Cross-Motion for March 19, 2019. (Dkt. No. 35.) On March 5, 2019, Plaintiff requested an adjournment of the argument. (Dkt. No. 36.) The Court cancelled the argument, but informed Plaintiff that the Court may issue an oral ruling. (Dkt. No. 37.) On March 19, 2019, the Court issued an oral ruling and granted Defendants' Motion To Dismiss Plaintiff's FAC without prejudice, finding that the claim was time-barred by the six-year statute of limitations applicable to fraud claims, and that the claim was not saved by the two-year discovery rule. (*See* Mar. 20, 2019 Order ("Order") (Dkt. No. 39); Mar. 19, 2019 Hr'g Tr. ("Hr'g Tr.") (Dkt. No. 49).)

On April 18, 2019, Plaintiff filed the SAC. (Dkt. No. 41.) With leave of the Court, Defendants filed the instant Motion on July 26, 2019. (Defs.' Mot.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 56); Decl. of Gary J. Mouw, Esq. in Supp. of Mot. ("Mouw Decl.") (Dkt. No. 57).) On August 23, 2019, Plaintiff filed an Opposition. (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 58).) Defendants filed a Reply on September 6, 2019. (Defs.' Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 59).)

## II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Further, generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents

appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted).

B. Analysis

Defendants move to dismiss the SAC pursuant to Federal Rule 12(b)(6), arguing that Plaintiff's claim is time-barred. (*See generally* Defs.' Mem.)

1. Applicable Law

"Under New York law, the time within which an action based upon fraud must be commenced is 'the greater of six years from the date the cause of action accrued or two years from the time the plaintiff discovered the fraud, or could with reasonable diligence have discovered it.'" *Koch*, 699 F.3d at 154 (alteration omitted) (quoting N.Y. C.P.L.R. § 213(8)); *see also Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) ("The statute of limitations for fraud and for aiding and abetting fraud is 'the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it.'" (quoting N.Y. C.P.L.R. § 213(8))). Generally, "[b]ecause a statute of limitations defense can be highly fact dependent, a motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations," and "[d]istrict courts have not dismissed actions as untimely on Rule 12(b)(6) motions unless the complaint shows clearly that a claim is not timely." *Canon U.S.A., Inc. v. Cavin's Bus. Sols. Inc.*, 208 F. Supp. 3d 494, 501 (E.D.N.Y. 2016) (citation, alteration, and quotation marks omitted).

A claim based on fraud "accrues as soon as 'the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint.'" *Sejin Precision Indus. Co. v.*

9

*Citibank, N.A.*, 235 F. Supp. 3d 542, 550 (S.D.N.Y. 2016) (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 273 (N.Y. 2009)). A claim for fraudulent inducement "must be brought within six years of when the party alleging fraud has given consideration and thus suffered damage." *Plitman v. Leibowitz*, 990 F. Supp. 336, 337 (S.D.N.Y. 1998) (citation and quotation marks omitted); *see also Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 748 (2d Cir. 1979) (same).

The discovery rule "postpones the accrual of a cause of action from the time when the tort is complete to the time when the plaintiff has discovered sufficient facts to make him aware that he has a cause of action." *Ruso v. Morrison*, 695 F. Supp. 2d 33, 45 (S.D.N.Y. 2010) (citation and quotation marks omitted). In order to invoke this rule for a fraud-based claim, "[t]he plaintiff bears the burden of establishing that the fraud could not have been discovered before the two-year period prior to commencement of the action." *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007). "Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Id.* (citation, alteration, and quotation marks omitted). "A plaintiff need not be on notice of the entire fraud to trigger a duty to inquire; he need have only sufficient operative facts that indicate that further inquiry is necessary." *Brown v. Kay*, 889 F. Supp. 2d 468, 483 (S.D.N.Y. 2012) (citations and quotation marks omitted).[2]

---

[2] The Court previously determined that Plaintiff was on inquiry notice on May 6, 2015 at the latest, when the superseding indictment for Lees, DiCello, and Mr. Barnett was announced. (Hr'g Tr. 14.) Thus, because Plaintiff did not file his Complaint until 2018, the discovery rule did not—and does not—apply to save any of Plaintiff's claims that are otherwise barred by the six-year accrual-based statute of limitations. (*Id.*)

### 2. Accrual of Claims

The Court first addresses the dispute over whether Plaintiff's claims accrued at the time of Plaintiff's investments, for which the latest date is December 2012, or at the time of Plaintiff's agreements to purchase membership interests in VCH, WOTHV, and Wappinger, for which the latest date is June 2011. (Defs.' Mem. 5–8; Pl.'s Mem. 2–6.)

Plaintiff's claim is framed as one for fraudulent inducement. Plaintiff alleges that he invested in the subject properties "[r]elying on [Defendants'] representations . . . and . . . omissions." (SAC ¶¶ 16, 18.) He also asserts that if Defendants "had disclosed" the fact that they intended to obtain HUD-insured financing via an alleged illegal kickback scheme, he "would not have purchased and/or maintained his membership interests in VCH, HSD . . . , WOHTV . . . [,] and [Wappinger]." (*Id.* ¶ 13.)

As previously discussed by this Court, (Hr'g Tr. 8), and by Defendants in their first Motion To Dismiss, (Defs.' FAC Mem. 8), "[i]n New York, an investment-based fraud claim accrues on the date of the purchase of the securities," *Cupersmith v. Piaker & Lyons P.C.*, No. 14-CV-1303, 2016 WL 5394712, at *10 (N.D.N.Y. Sept. 27, 2016) (finding that an aiding and abetting fraud claim accrued "on the date(s) that the [p]laintiff purchased a[n] . . . investment product") (collecting cases), *aff'd sub nom. Ayers v. Piaker & Lions, P.C.*, 748 F. App'x 368 (2d Cir. 2018); *Matana v. Merkin*, 957 F. Supp. 2d 473, 486 (S.D.N.Y. 2013) ("[The plaintiff's] causes of action based on fraudulent misrepresentations or omissions in the offering documents accrued on the [two] dates it invested in [the] . . . [f]und . . . ." (citation omitted) (collecting cases)); *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (finding that the transaction at issue occurred, "at the latest," when Plaintiff signed a trade confirmation); *Plitman*, 990 F. Supp. at 337 (finding that the claim accrued on the date on which the plaintiff

invested $100,000); *Varga v. McGraw Hill Fin., Inc.*, 48 N.Y.S.3d 24, 26 (App. Div. 2017) (finding that fraud claims accrued upon "the last purchase of securities") (citation omitted)), *leave to appeal denied*, 80 N.E.3d 405 (N.Y. 2017); *D. Penguin Bros. v. Nat'l Black United Fund, Inc.*, 26 N.Y.S.3d 524, 526 (App. Div. 2016) (finding that the fraud claim accrued when the plaintiff was "induced" to invest); *Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (App. Div. 2007) (finding that the fraud claim accrued "when the plaintiff transferred the money in reliance upon the defendants' allegedly false representations"); *cf. Koch*, 699 F.3d at 154 (noting that the fraud claim accrual date was the date "the alleged fraud was completed . . . when [the plaintiff] purchased the [fraudulent goods]"); *BRS Assocs., L.P. v. Dansker*, 246 B.R. 755, 765 (Bankr. S.D.N.Y. 2000) (finding, in the context of federal securities laws, that the statute of limitations period "started to run for each [p]laintiff on the last date that they each purchased [p]artnership [i]nterests" (footnote omitted)). Thus, Plaintiff's claims of fraudulent inducement would accrue on the dates of Plaintiff's respective investments in VCH, HSD, WOHTV, and Wappinger. The question of whether these claims accrued separately, on the date of each investment, or together, on the date of the last investment in Wappinger, is addressed below. (*See infra* 14.)

Defendants rely on two New York cases, *Pike v. N.Y. Life Ins. Co.*, 901 N.Y.S.2d 76 (App. Div. 2010), and *Golding v. Nationscredit Fin. Servs. Corp.*, No. 14418/2011, 2012 WL 2194531 (N.Y. Sup. Ct. Apr. 17, 2012), to argue that Plaintiff's claims should accrue at the time that Plaintiff entered into agreements with Ms. Barnett, DES, and Wappinger. (Defs.' Mem. 2, 8–10.) In *Pike*, however, the plaintiffs claimed that they were fraudulently induced to enter into insurance contracts, for which there is specific New York law on when the statute of limitations accrues. *See Pike*, 901 N.Y.S.2d at 81 ("[A]ny wrong accrued at the time of the purchase of the policies, not at the time of payment of each premium."); *see also N.Y. Univ. v. Factory Mut. Ins.*

*Co.*, No. 15-CV-8505, 2018 WL 1737745, at *7 (S.D.N.Y. Mar. 27, 2018) ("When the plaintiff alleges fraud in the inducement to purchase an insurance policy, the six-year limitations period begins to run on the date the policy is purchased," and not the date on which subsequent premiums are paid. (citations and quotation marks omitted) (collecting cases)). Similarly, *Golding* relates not to a claim of fraudulently induced investments, but instead to a mortgage-related agreement, under which installment payments were subsequently made and an agreement was formally executed. 2012 WL 2194531. Here, while Plaintiff alleges that he "entered into [] agreement[s]" to purchase membership interests, (SAC ¶¶ 15–16, 18), it is not clear from the face of the Complaint that those agreements were formally executed documents as in *Pike* and *Golding*.

Lastly, Defendants cite *Prichard v. 164 Ludlow Corp.*, 854 N.Y.S.2d 53 (App. Div. 2008), for the proposition that a cause of action for a fraudulently induced investment accrued when the plaintiffs "entered into the contract to purchase shares in the corporation." *Id.* at 54. There, unlike here, the plaintiffs appear to have purchased the stock at the same time that they entered into the contract, thus "complet[ing] the act that the alleged fraudulent statements had induced." *See id.*; *Prichard v. 164 Ludlow Corp.*, 831 N.Y.S.2d 362 (Table) (Sup. Ct. 2006) (noting that the plaintiffs alleged that they "purchased stock" in "19[9]7"), *aff'd by* 854 N.Y.S.2d 53 (App. Div. 2008); *cf. Sejin Precision Energy Co., Ltd. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 550 (S.D.N.Y. 2016) (assessing, in the context of investments made pursuant to contracts for certain financial products, the dates that losses were incurred, trades were made, and options were exercised under such contracts for the purpose of determining when, "at the latest," the plaintiffs' claims accrued); *Long Island Lighting Co. v. Transam. Delaval, Inc.*, 646 F. Supp. 1442, 1449 (S.D.N.Y. 1986) (finding that the latest date on which the plaintiff's fraudulent

13

inducement claim could have accrued was the date on which the plaintiff may have paid for a product, not the date on which the parties entered into a contract to purchase it); *SSR II, LLC v. John Hancock Life Ins. Co. (U.S.A.)*, 964 N.Y.S.2d 63 (Table) (Sup. Ct. 2012) (finding that the plaintiff suffered an injury when its money was invested through its life insurance policies, not on the date of purchase of those policies).

Thus, as this Court previously found, Plaintiff's claim "accrued, at the very latest . . . when [P]laintiff made his final investment in reliance, allegedly, on [Mr.] Barnett's misrepresentations." (Hr'g Tr. 12.) Drawing all reasonable inferences in favor of Plaintiff, his alleged final investment occurred in December 2012. (Compl. ¶ 18.)

### 3. Continuing Violation Doctrine

Defendants argue that Plaintiff's fraudulent inducement claims as to each agreement must be evaluated separately to determine whether each claim is barred by the statute of limitations. (Defs.' Mem. 6, 11–12.) Plaintiff contends that all of his claims survive because "all three properties were part of the same fraud stemming from the material omission by certain third parties," and "[P]laintiff's investment in the Wappinger Property in December[] 2012 conclusively places this lawsuit within the applicable [six]-year statute of limitations." (Pl.'s Mem. 2, 7–8 (citation omitted).)

By arguing that all of his claims survive, Plaintiff attempts to invoke the continuing violation doctrine. This doctrine is "usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." *Henry v. Bank of Am.*, 48 N.Y.S.3d 67 (App. Div. 2017) (quoting *Selkirk v. State of New York*, 671 N.Y.S.2d 824 (App. Div. 1998)). When applicable, "the doctrine will save all claims for recovery of damages but only to the extent of wrongs committed within the

14

applicable statute of limitations." *Id.* (citations omitted). However, the continuing violation doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct." *Gonzales v. Nat'l Westminster Bank PLC*, No. 11-CV-1435, 2013 WL 6978874, at *4 (S.D.N.Y. Nov. 18, 2013) (alteration and quotation marks omitted) (quoting *Selkirk*, 671 N.Y.S.2d 824); *see also Quintana v. Wiener*, 717 F. Supp. 77, 80 (S.D.N.Y. 1989) ("The accrual date for the statute of limitations does not change on the theory that the alleged misconduct created continuing consequential damages." (alteration and quotation marks omitted) (quoting *Piracci Constr. Co. v. Skidmore, Owings & Merrill*, 490 F. Supp. 314, 321 (S.D.N.Y 1980), *aff'd*, 646 F.2d 562 (2d Cir. 1981))).

Here, Plaintiff does not allege that Defendants committed wrongs during the statutory period such that the continuing violation doctrine would apply. Instead, Plaintiff alleges that the *effects* of Defendants' earlier misconduct continued to occur into the statutory period. Plaintiff specifically alleges that Mr. Barnett made the fraudulent representations that induced Plaintiff's investments in April 2009 and June 2011. (SAC ¶¶ 12, 14, 17.) Plaintiff also arguably alleges that Lees and DiCello made misrepresentations to Plaintiff in September 2009. (*Id.* ¶ 23.) All of these misrepresentations "are alleged to have occurred during a discrete period of time," more than six years before Plaintiff's Complaint was filed. *Rabouin v. Metro. Life Ins. Co.*, 699 N.Y.S.2d 655, 660 (Sup. Ct. 1999) (citation omitted). Plaintiff does not allege that Defendants made any misrepresentations within the statutory period, claiming only that he made certain payments to, or investments in, Wappinger during that time. However, "it is irrelevant for purposes of the [s]tatute of [l]imitations that [P]laintiff [] continue[d] to be damaged as a result of th[e earlier] acts" by Defendants, *id.* (citation omitted), because Plaintiff has not alleged any "wrongs committed within the applicable statute of limitations period," *Henry*, 48 N.Y.S.3d at 70

15

(finding that "monthly billings . . . represent[ed] the consequences of . . . wrongful acts in the form of continuing damages, not the wrongs themselves"); *see also Pike*, 901 N.Y.S.2d 76 (finding that the plaintiffs did not have a claim under the continuing violation doctrine because they "d[id] not point to any specific wrong that occurred each time they paid a premium, other than having to pay it"); *Selkirk*, 671 N.Y.S.2d at 825 (determining that the claimants did not have a claim under the continuing violation doctrine because they "continued to suffer damages from the date of the . . . wrongful acts," but no wrongful acts occurred in the limitations period). Conversely, in cases where courts have applied the continuing violation doctrine, the defendants have committed continuing wrongful acts within the statutory period. *See Barash v. Estate of Sperlin*, 706 N.Y.S.2d 439 (App. Div. 2000) (determining that continuing wrongs accrued each time that the defendants failed to give a proper percentage of collected income to the plaintiff); *Butler v. Gibbons*, 569 N.Y.S.2d 722 (App. Div. 1991) (applying the continuing violation doctrine when the defendant repeatedly failed to give property rental proceeds to the plaintiff because "a new cause of action accrued each time [the] defendant . . . kept the[ rents] to himself" (citation omitted)). Even if Plaintiff were to argue that VCH's alleged omissions, (SAC ¶ 13), continued into the statutory period, the continuing violation doctrine would remain inapplicable. *See Gonzales*, 2013 WL 6978874, at *4 ("[A]t best[, the plaintiffs] allege a continuous omission. . . . [The] [p]laintiffs' allegation merely reflects [the] [d]efendant's ongoing failure to fix a past wrong . . . as opposed to [the] [d]efendant's committing any new misdeeds."); *Seippel v. Jenkins & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 376 (S.D.N.Y. 2004) (stating, in the context of a professional malpractice action, "our law cannot permit a limitations period to depend on a continuing omission that can go on for decades" (citation and quotation marks omitted)).

Thus, Plaintiff's claims related to any investments made in VCH, HSD, WOTHV, and Wappinger prior to March 7, 2012, six years before the filing of Plaintiff's initial Complaint, are time-barred. *See BRS Assocs.*, 246 B.R. at 773 & n.7 (considering the dates of each partnership interest purchase to determine which claims were time-barred). Given that Plaintiff is counseled and has already had an opportunity to amend his Complaint, the Court dismisses these claims with prejudice. *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting a motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (citation, alteration, and quotation marks omitted)). Any claims related to investments made, at the earliest, on March 7, 2012 survive.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion with respect to investments made by Plaintiff prior to March 7, 2012 and denies Defendants' Motion with respect to investments made by Plaintiff on or after March 7, 2012.

The Clerk of the Court is respectfully directed to terminate the pending motion, (Dkt. No. 55). The Court will hold a Status Conference on Tuesday, March 5, 2020 at 11:30 a.m.

SO ORDERED.

Dated: January 27, 2020
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE